UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----oo0oo----

UNITED STATES OF AMERICA,          NO. CIV. 97-0085-S-BLW

        Plaintiff,

    v.                                 <u>ORDER AND MEMORANDUM RE:</u>
                                   <u>PLAINTIFF'S MOTION FOR SUMMARY</u>
ESTATE OF ROGER J. OXARANGO,       <u>JUDGMENT</u>
Deceased; ROSE OXARANGO *aka S.*
*ROSE OXARANGO aka SARA R.*
*OXARANGO*, successor-in-interest
to Roger J. Oxarango; and ROBERT
JEAN OXARANGO and ROCHELLE ANNE
OXARANGO dba OXARANGO LAMB &
WOOL,

        Defendants.
_____/

----oo0oo----

      Plaintiff United States of America ("Government"),

acting on behalf of the Farm Service Agency (FSA), brought this

action to collect an indebtedness and foreclose on real estate

mortgages.  Defendants are Rose Oxarango, who with her husband

(now deceased) executed the mortgages in favor of the FSA; the

Estate of Roger J. Oxarango; and Robert Jean Oxarango and

Rochelle Anne Oxarango, d.b.a. Oxarango Lamb & Wool, who

currently have possession of the real property in question.  The Government now moves for summary judgment.

I.  <u>Factual and Procedural Background</u>

The facts of this case concern multiple transactions between Roger and Rose Oxarango ("Oxarangos") and the FSA.[1] During the relevant time periods, the Oxarangos were sheep ranchers in Idaho.  (Oxarango Aff. ¶ 10.)  Beginning in 1963 or 1964, the Oxarangos established a relationship with Idaho First Bank and Trust in Malad, Idaho ("Bank"), from which the Oxarangos borrowed money "on many occasions" to cover operating expenses and improvements to their property.  (<u>Id.</u> ¶ 11.)

On February 29, 1972, the Oxarangos received a Farm Ownership loan of $51,700 ("1972 loan") from the United States, acting through the FSA.  (Oxarango Aff. ¶ 13; Gillespie Decl. ¶ 2, Ex. A.)  The Oxarangos executed and delivered a forty-year promissory note ("1972 note") to the FSA evidencing the loan and promising to repay the loan amount plus five-percent interest per annum in annual payments of $3013.  (Gillespie Decl. Ex. A.)  To secure payment of the note, the Oxarangos executed and delivered to the FSA a mortgage encumbering their real property in Minidoka and Bear Lake Counties.  (<u>Id.</u> Ex. B.)

The next transaction followed more than three years later.  On December 30, 1975, the FSA issued the Bank a Contract of Guarantee that guaranteed a line of credit from the Bank to

---

[1]   During the time of the Oxarangos' loans, the agency currently known as the FSA was also known as the Farmers Home Administration (FmHA) and the Consolidated Farm Service Agency. For convenience, the court will refer to the agency by its current name, unless such reference would be confusing in context.

2

the Oxarangos for up to $350,000.  (Id. Exs. C, D.)  The Contract

of Guarantee was apparently based on an Application for

Guaranteed Loan, signed by Roger Oxarango, and a Request for

Contract of Guarantee, signed by Michael Broadhead, Vice

President and Manager of the Bank ("Broadhead").  (Id. Exs. E,

F.)  While the FSA's records are not complete (id. ¶ 6), it

appears that the Bank made at least one loan for $190,000 under

the Contract of Guarantee (id. Ex. I), and as part of that

transaction, the Oxarangos executed a promissory note and

mortgage encumbering their Minidoka County and Bear Lake County

real property.  (Id.)

Defendants dispute that any loans were made by the Bank

under the Contract of Guarantee.  Rose Oxarango, by affidavit,

states that she does not remember asking to apply for the

Contract of Guarantee and that no loans pursuant to that Contract

of Guarantee were ever referenced or discussed by the Bank or any

government representative.  (Oxarango Aff. ¶¶ 15-16.)  Moreover,

in a letter dated December 23, 1988, Dee L. Seamon, the FSA

County Supervisor in Boise, informed Rose Oxarango that a review

of the FSA files at that point did not show any of the promissory

notes used by the Bank to secure repayment of loans under the

Contract of Guarantee.  (Id. Ex. A.)

In the final relevant transaction, on November 1, 1978,

the Oxarangos applied for a loan of $400,000 from the FSA for the

purpose of "[r]efinanc[ing] short-term bank debt."  (Gillespie

Decl. Ex. M.)  The Bank had informed the Oxarangos that their

finances at the Bank were "in arrears" and that the $400,000 loan

from the FSA would "increase [the Bank's] ability to lend [them]

more money for [their] sheep business." (Oxarango Aff. ¶ 19.)
On the Application for FHA Services and the Farm and Home Plan
signed by the Oxarangos as part of their loan application, the
Oxarangos listed two outstanding loans held by the Bank totaling
$423,653. (Gillespie Decl. Exs. M, N.)

The Oxarangos were approved on March 6, 1979, for a
$400,000 Economic Emergency (EE) loan ("1979 loan"). (Id. ¶ 15,
Ex. T.) On April 20, 1979, the Oxarangos executed and delivered
to the FSA a forty-year promissory note ("1979 note") evidencing
the loan and promising to repay the $400,000 plus eight-and-one-
half-percent interest per annum in annual payments of $35,356.
(Id. Ex. AA.) To secure payment of the 1979 note, and to further
secure payment of the 1972 note, the Oxarangos executed and
delivered to the FSA a mortgage encumbering their real property
in Minidoka County and Bear Lake County. (Id. Ex. BB.) In
accordance with closing instructions issued by the FSA and the
Closing Statement signed by the Oxarangos, the closing agent
issued a check payable to the Bank for $400,000 with "payment in
full of Roger Oxarango mortgages" in the memo line. (Id. Exs. U,
Y, Z.) The Bank deposited the check and discharged its mortgages
on the Oxarangos' real property in Bear and Minidoka counties
held to secure payment of an unspecified $190,000 obligation.
(Gillespie Decl. Exs. Y, CC.)

There is evidence that the Oxarangos did not actually
receive the proceeds of the $400,000 loan. Specifically, Rose
Oxarango states that the loan proceeds were never deposited into
their account (Oxarango Aff. ¶ 21), and a certified public
accountant and a certified fraud examiner who reviewed the Bank's

4

records and the Oxarangos' statements concluded that the proceeds were never credited to the Oxarangos (Ilett Aff. ¶¶ 3-5; Gilbeau Aff. ¶¶ 3-5).  In addition, an attorney from the FSA Office of General Counsel acknowledged in 1990 that the Bank misappropriated the loan proceeds through a dummy account in the Oxarangos' name.  (Oxarango Aff. Ex. B.)

The Oxarangos made annual payments on the 1972 and 1979 notes through 1984, but have not made any payments since September 10, 1984.  (Gillespie Decl. Ex. EE.)  The Oxarangos entered bankruptcy in 1985.  (Oxarango Aff. ¶ 23.)  The FSA submitted a secured proof of claim in the amount of $482,478.80 in those proceedings.  (Gillespie Decl. Ex. FF.)  The Oxarangos' bankruptcy case was dismissed on July 7, 1992.  (Id. Ex. HH.)  At some point, the Bank apparently also went bankrupt.  In connection with that proceeding, the Oxarangos brought and settled an adversary proceeding with the FDIC, the successor in interest to the Bank, over a claim of $187,244 that does not appear to be related to the FSA loans.  (Id. Ex. GG; Oxarango Aff. ¶ 23.)

From 1992-1995, the Oxarangos made three administrative appeals related to their loans with the FSA: one concerning the valuation of the real estate used to secure the loans (Gillespie Decl. Ex. II), and two concerning FSA loan servicing programs (id. Exs. JJ, KK).  On August 11, 1995, the FSA provided notice of acceleration of debt to the Oxarangos for the 1972 and 1979 loans.  (Id. Ex. LL.)  The instant action was filed by the Government on March 4, 1997, but was then terminated without prejudice by stipulation because the Oxarangos had filed an

administrative complaint on May 29, 1997, alleging discriminatory treatment on the basis of national origin. (Id. Ex. NN.) A final determination in that administrative matter was entered in January 2007. (Id.)

The instant action was re-opened on January 3, 2008. Presently before the court is the Government's motion for summary judgment to collect an indebtedness and foreclose real estate mortgages executed in favor of the FSA in connection with the 1972 and 1979 loans. The Government is not seeking a deficiency judgment. (Gov.'s Mem. Supp. Mot. S.J. 2.)

II. Discussion

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Id. at 256.

On issues for which the ultimate burden of persuasion at trial lies with the nonmoving party, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the nonmoving party's case or by demonstrating that the nonmoving party cannot produce evidence to support an essential element of its claim or

1  defense.  <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,</u>
2  <u>Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).

3        Once the moving party carries its initial burden, the
4  nonmoving party "may not rely merely on allegations or denials in
5  its own pleading," but must go beyond the pleadings and, "by
6  affidavits or as otherwise provided in [Rule 56,] set out
7  specific facts showing a genuine issue for trial."  Fed. R. Civ.
8  P. 56(e); <u>Celotex Corp.</u>, 477 U.S. at 324; <u>Valandingham v.</u>
9  <u>Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).  On those issues
10 for which it will bear the ultimate burden of persuasion at
11 trial, the nonmoving party "must produce evidence to support its
12 claim or defense."  <u>Nissan Fire</u>, 210 F.3d at 1103.

13       In its inquiry, the court must view any inferences
14 drawn from the underlying facts in the light most favorable to
15 the nonmoving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith</u>
16 <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The court also may not
17 engage in credibility determinations or weigh the evidence, for
18 these are jury functions.  <u>Anderson</u>, 477 U.S. at 255.

19       A.   <u>Evidentiary Objections</u>

20       "A trial court can only consider admissible evidence in
21 ruling on a motion for summary judgment."  <u>Orr v. Bank of Am., NT</u>
22 <u>& SA</u>, 285 F.3d 764, 773-74 (9th Cir. 2002); <u>see</u> Fed. R. Civ.
23 Proc. 56(e) ("supporting or opposing affidavit must . . . set out
24 facts that would be admissible in evidence . . . .").  Defendants
25 challenge the Declaration of Kent J. Gillespie ("Gillespie
26 Declaration") and the admissibility of its attached exhibits
27 submitted by the Government in connection with its motion for
28 summary judgment.

First, defendants challenge the foundation of the exhibits attached to the Gillespie Declaration, citing Federal Rule of Evidence 902. (Defs.' Opp'n Mem. 12.)  The Ninth Circuit has repeatedly held that "'documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment.'"  Beyene v. Coleman Sec. Servs, Inc., 854 F.2d 1179, 1182 (9th Cir. 1988) (quoting Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987)).  "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Certain documents may be self-authenticating, thus obviating the need to establish foundation with extrinsic evidence.  See Id. Rule 902.

Defendants' blanket assertion that the Government's exhibits lack foundation is untenable.  At the very least, recorded mortgages and promissory notes qualify as self-authenticating documents, and therefore do not depend on the Gillespie Declaration for foundation.  See United States v. Parkhurst, No. 05-00276, 2006 WL 291657, at *3 n.2 (D. Haw. Feb. 6, 2006) (finding mortgages self-authenticating under federal rule of evidence 902(8) because they are notarized; United States v. Carriger, 592 F.2d 312, 316 (6th Cir. 1979) (explaining that promissory notes are self-authenticating under Federal Rule of Evidence 902(9)).  As for non-self-authenticating exhibits, Mr. Gillespie stated that he is "the custodian of the [FSA's] loan files for the [Oxarangos]" and that he "ma[d]e []his declaration based on [his] review of [their] contents." (Gillespie Decl. ¶ 1.)  In describing each exhibit, Mr. Gillespie

8

stated that "[a] true and correct copy of [the document] is attached." (See, e.g., Id. ¶ 2.) Pursuant to Federal Rule of Evidence 901(a), Mr. Gillespie's role as file custodian and review of the Oxarangos' file are "sufficient to support a finding that the [exhibits] in question [are] what [their] proponent claims"--documents related to the FSA's loan transactions with the Oxarangos.

Second, defendants contend that Mr. Gillespie lacks personal knowledge about the facts of this case and is not familiar with the Oxarangos' file. (Defs.' Opp'n Mem. 8, 12; Gillespie Dep. 30:10-12.) While Federal Rule of Civil Procedure 56(e) requires that an affidavit be "made on personal knowledge," the rule can be satisfied when the affidavit is made by a custodian and based upon the affiant's personal review of government or business files. See Vote v. United States, 753 F. Supp. 866, 868 (D. Nev. 1990) (finding that an Internal Revenue Officer's review of a taxpayer's records satisfied the requirement of personal knowledge), aff'd 930 F.2d 31 (9th Cir. 1991); Parkhurst, 2006 WL 291657, at *3 (concluding that an FSA file custodian had sufficient familiarity to satisfy Federal Rule of Civil Procedure 56(e)); Miller v. Bank of Am., N.A., No. 01-1651, 2005 WL 1902945, at *5 n.3 (D.D.C. July 13, 2005) (rejecting an objection to a declaration by a bank record custodian for lack of personal knowledge about the facts of the case).

Finally, defendants argue that the Gillespie Declaration is somehow insufficient because Mr. Gillespie admitted in his subsequent deposition that he did not author the

document or select the exhibits attached to it.  (Defs.' Opp'n
Mem. 12; Gillespie Dep. 14:16-19.)   The identity of the person
who prepared a declaration or affidavit, however, is not
determinative of its validity; it is widely recognized that
affidavits and declarations are often written by attorneys and
not the declarant or affiant.  <u>See</u> <u>Ciccarelli v. Gichner Sys.
Group, Inc.</u>, 862 F. Supp. 1293, 1299 n.5 (M.D. Pa. 1994);
<u>Safeflight, Inc. v. Chelton Flight Sys., Inc.</u>, 543 F. Supp. 2d
779, 788 (N.D. Ohio 2008).   "The real question is whether the
affiant reviewed the affidavit and swore to the truth of the
matters asserted therein."   <u>Safeflight</u>, 543 F. Supp. 2d at 788.
Here, Mr. Gillespie signed and dated the affidavit below the
statement, "I declare under penalty of perjury the foregoing is
true and correct," (Gillespie Decl. 11-12), and nothing in Mr.
Gillespie's deposition suggests that he did not review the
declaration before signing it.

     Accordingly, the court may consider the Gillespie
Declaration and the attached exhibits in connection with the
instant motion.

     B.   <u>The 1972 and 1979 Loans</u>

     Federal law governs the construction and interpretation
of contracts where the federal government is a party.  <u>Klamath
Water Users Protective Ass'n v. Patterson</u>, 204 F.3d 1206, 1210
(9th Cir. 1999) (citing <u>O'Neill v. United States</u>, 50 F.3d 677,
682 (9th Cir. 1995)); <u>accord</u> <u>Saavedra v. Donovan</u>, 700 F.2d 496,
498 (9th Cir. 1983).   In formulating federal rules, "guidance is
gained from general principles for interpreting contracts."
<u>Saavedra</u>, 700 F.2d at 498 (citing <u>United States v. Seckinger</u>, 397

U.S. 203, 209-11 (1970)).  However, in the absence of "an overriding federal interest in uniformity, the applicable state law provides the rule of decision." Great Sw. Life Ins. Co. v. Frazier, 860 F.2d 896, 899 (9th Cir. 1988) (citing United States v. Yazell, 382 U.S. 341, 348-49 (1966)).[2]

"Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" Resolution Trust Corp. v. Starkey, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting F.D.I.C. v. Cardinal Oil Well Serv. Co., 837 F.2d 1369, 1371 (5th Cir. 1988)).  To enforce a promissory note, the moving party may prevail on summary judgment if it presents evidence of the existence of the note, the other party's default, and the amount due.  United States v. Freeman, No. 01-1859, 2002 WL 467688, at *1 (N.D. Cal. Mar. 25, 2002) (citing United States v. Irby, 517 F.2d 1042, 1043 (5th Cir. 1975)); cf. United States v. Pritchett Farms, Inc., No. 07-3090, 2008 WL 4282754, at *2 (E.D. Wash. Sept. 17, 2008) ("In order to prevail in a summary judgment motion, Plaintiff . . . 'must establish the note in question, that [Defendants] signed the note, that [Plaintiff] was the legal owner and holder thereof, and that a certain balance was due and owing on the note.'" (quoting Starkey, 41 F.3d at 1023) (alterations in original)).

The parties do not dispute the existence or validity of the 1972 and 1979 notes and related mortgages, the date of the Oxarangos' last payment, or the amount now due if the notes are

---

[2]     The parties have not argued that there exist distinctions between Idaho law and general contract principles relevant to the court's decision on this motion.

found enforceable.  The Oxarangos made twelve annual payments of $3013 on the 1972 loan and five annual payments of $35,356 on the 1979 loan, but have failed to make any payments since September 10, 1984.  (<u>Id.</u> Ex. EE.)  As of August 14, 2008, the Oxarangos owed the United States a total of $1,293,749.48 ($457,709.84 in principal and $836,039.64 in interest), with $99.1894 accruing daily.  (<u>Id.</u> Ex. PP.)

Before the FSA may accelerate or foreclose a loan or take any collection action, it must first provide notice to the borrowers of loan servicing programs and the opportunity to administratively appeal the notice or a denial of loan servicing. <u>See</u> <u>Pritchett Farms, Inc.</u>, 2008 WL 4282754, at *3; 7 U.S.C. §§ 1981d, 2001(g).  It is undisputed that the FSA satisfied these obligations.  (<u>See</u> Gillespie Decl. Exs. JJ, KK.)  The FSA provided notice of acceleration of both loans to the Oxarangos on August 11, 1995.  (Gillespie Decl. Ex. LL.)  The notice stated that unless the Oxarangos delivered full payment within thirty days of the date of notice, the United States would foreclose. (<u>Id.</u>)

In opposition to the instant motion, defendants contend only that the Government is not entitled to summary judgment in its favor based on four defenses: failure of consideration, fraud, and laches with respect to the 1979 note; and payment in full with respect to the 1972 note.  Because the defense to the 1972 note depends upon the enforceability of the 1979 note, the defenses to the enforcement of the 1979 note will be considered first.

1.   <u>Failure of Consideration</u>

12

Failure of consideration renders a contract unenforceable when, "because of supervening events, the promised performance fails[.]" World Wide Lease, Inc. v. Woodworth, 728 P.2d 769, 773 (Idaho Ct. App. 1986); see In re MJK Clearing, Inc., 408 F.3d 512, 515 (8th Cir. 2005) ("When there is failure of consideration, a contract . . . becomes unenforceable because the performance bargained for has not been rendered." (quoting Franklin v. Carpenter, 244 N.W.2d 492, 495 (Minn. 1976)). Failure of consideration is distinct from the concept of lack or want of consideration, which describes an absence of consideration to support a contract that renders it invalid from the beginning. World Wide Lease, Inc., 728 P.2d at 773-74; see Restatement (Second) of Contracts § 237 cmt. a (1981) (referring to the doctrine as "failure of performance" to avoid confusion with the lack of consideration).

A failure of consideration may serve as a complete defense to the enforcement of a contract against the non-breaching party if the failure has been complete. In re Topco, Inc., 894 F.2d 727, 742 (5th Cir. 1990) (citing Food Mach. Corp. v. Moon, 165 S.W.2d 773 (Tex. Civ. App. 1942); cf. Good v. Hansen, 719 P.2d 1213, 1216 (Idaho Ct. App. 1986) ("Rescission is available when there is a substantial failure of consideration affecting the entire contract."). Generally, failure of consideration can be a valid defense to the enforcement of a negotiable note by a non-holder-in-due-course. See, e.g., Langley v. F.D.I.C., 484 U.S. 86, 92 (1987) (recognizing failure of consideration on a note as "the failure to perform a promise that was a condition precedent to the maker's performance");

13

<u>F.D.I.C. v. Meo</u>, 505 F.2d 790 (9th Cir. 1974) (finding that a note maker was not estopped from claiming failure of consideration for a promissory note); <u>In re Nusor</u>, 123 B.R. 55, 60 (B.A.P. 9th Cir. 1991) (recognizing that a non-holder-in-due-course is subject to the defense of failure of consideration). <u>See generally</u> 3 Williston on Contracts § 7:11 (4th ed. & Supp. 2008) (describing failure of consideration under the Uniform Commercial Code).

The parties do not dispute that the FSA's promised performance for the 1979 loan encompassed the disbursement of a $400,000 loan for the purpose of refinancing the Oxarangos' debt or that the FSA, through the escrow agent, issued a check made payable to the Bank for $400,000 with "payment in full of Roger Oxarango mortgages" written on the memo line. (Gillespie Decl. Ex. Y.) Defendants contend, however, that the FSA failed to render its promised performance when it issued the loan check directly to the Bank, rather than to the Oxarangos, and the Bank thereafter misappropriated the money. (Defs.' Opp'n Mem. 5-6.)

In particular, the notice of approval of the loan sent by the FSA to the Oxarangos appears to obligate the FSA to issue the check directly to the borrower. The approval, sent in the form of a countersigned Request for Obligation of Funds, states that "[t]he loan will be closed in accordance with FmHA Instruction 427.1" (Gillespie Decl. Ex. R.) Defendants have submitted a letter entitled "Administration Letter 92(427)," obtained from the FSA office in Boise, which purports to amend FmHA Instruction 427.1 and requires the FSA County Supervisor as part of a loan closing to "[f]urnish to the Escrow Agent the

14

1  check made payable to the borrower." (Oxarango Aff. ¶ 31, Ex. E

2  at 4 (emphasis added).)  Taking inferences favorable to the

3  nonmoving party, the incorporation of FmHA Instruction 427.1 into

4  the loan approval notice required the FSA to disburse loan funds

5  directly to the Oxarangos.

6       The Oxarangos' subsequent approval of disbursement to

7  the Bank, however, negates the significance of the FSA's promised

8  adherence to FmHA Instruction 427.1.  On the day of closing, the

9  Oxarangos signed the Closing Statement, which indicated that the

10 $400,000 would go directly to the Bank.  (Gillespie Decl. Ex. Z.)

11 Their signatures appear below the statement: "I/we have examined

12 the above statement and find it correct.  This acknowledges that

13 the above total sum has been disbursed as shown, with my/our

14 approval and for my/our account and benefit, in connection with

15 this mortgage loan transaction." (Id.)  This later approval by

16 the Oxarangos of disbursement directly to the Bank demonstrates

17 either that the parties agreed to a modification or that the

18 promise to issue a check directly to the Oxarangos was not a

19 material term of the bargain underlying the 1979 loan.  Either

20 way, issuance of the loan check directly to the Bank instead of

21 to the Oxarangos did not constitute a failure of consideration

22 for the 1979 loan.

23       Furthermore, there is no evidence to support the

24 contention that direct payment to the Oxarangos instead of the

25 Bank would have somehow averted the Bank's misconduct.  The FSA

26 approved a loan to refinance the Oxarangos' short-term Bank debt

27 of $423,653--debt that the Oxarangos' represented on their loan

28 application materials that they owed the Bank.  (See id. Exs. M,

N.)  Consequently, even if the FSA had issued a check to the Oxarangos, they would still have had to eventually deliver the money to the Bank to retire those specific debts.  Defendants' suggestion that issuing the check to the Oxarangos would have resulted in a different outcome--one in which the Bank properly credited the Oxarangos in its books--is pure speculation.[3]

The Government has satisfied its initial burden on summary judgment by submitting sufficient evidence that the FSA rendered the promised performance and that there was no failure of consideration.  In a refinancing transaction like the 1979 loan, the consideration given by the second lender consists of a loan with more favorable terms that replaces the prior loan obligation owed to the original lender.  Here, the Oxarangos applied for a refinancing loan and specifically represented to the FSA that they owed the Bank on two loans totaling $423,653.  (See id.)  The Government has submitted evidence that the FSA issued a check to the Bank (the original lender), and that the Bank thereafter released the Oxarangos from obligations owed to the Bank by discharging mortgages held on the Oxarangos' real property.  (Id. Exs. Y, CC.)

---

[3]  Defendants may also be understood to dispute whether the Oxarangos did in fact owe the Bank the $423,653.  The Government contends that at least one of the specified Bank loans was made pursuant to the Contract of Guarantee (Gov.'s Mem. Supp. Mot. S.J. 11; Gillespie Decl. ¶ 7), while Rose Oxarango questions whether any such loans were made (Defs.' Opp'n Mem. 7; Oxarango Aff. ¶¶ 15-16).  However, it was the Oxarangos who represented to the FSA that they owed their bank of choice $423,653.  They, therefore, as opposed to the FSA, should bear the risk of any mistake in their representation.  The inaccuracy of the $423,653 sum thus does not provide a viable defense to the 1979 note.  See Restatement (Second) of Contracts §§ 152, 153 (1981) (stating that a party may void a contract for a mistake of fact only if it did not bear the risk of the mistake).

1    In response, defendants have not produced enough
2 evidence to create a genuine issue of material fact on whether
3 there was a failure of consideration.  Defendants' experts
4 explain that there was no record of a $400,000 deposit or credit
5 on the Oxarangos' account at the Bank and that the funds appear
6 to have been misappropriated.  (Ilett Aff. ¶ 5; Gilbeau Aff. ¶¶
7 4-5.)  Based on the incompleteness of the available records,
8 defendants assert that "[n]o one knows what, if anything, was
9 paid off."  (Defs.' Opp'n Mem. 11.)  However, the relevant
10 question is not whether the Bank's ledgers reflect a benefit to
11 the Oxarangos or specify which obligations were retired by the
12 loan, especially in light of evidence of the general inaccuracy
13 of those ledgers.  (See Ilett Aff. ¶ 6.)  Rather, the relevant
14 question is whether the Oxarangos actually received the benefit
15 of the 1979 loan because they no longer had to pay on the
16 purportedly refinanced obligations held by the Bank.  On that
17 question, there is no evidence suggesting that the Bank continued
18 to demand payment or that the Oxarangos ultimately had to repay
19 any of the $423,653 Bank debt specified on the FSA loan
20 application once the FSA disbursed the funds.

21    There is therefore no genuine issue of material fact
22 concerning whether the Oxarangos received the bargain-for
23 consideration for the 1979 loan.

24    2.  Fraud

25    If a party's assent to a contract is procured by fraud
26 or material misrepresentation by the other contracting party,
27 that assent is invalid and the contract is voidable.  LaPeter v.
28 Canada Life Ins. of Am., No. 19000, 2007 WL 2608837, at *4 (D.

17

1  Idaho Sept. 5, 2007) (citing <u>Robinson v. State Farm Mut. Auto.</u>

2  <u>Ins. Co.</u>, 45 P.3d 829, 838 (Idaho 2002); Restatement (Second) of

3  Contracts § 164(1) (1981). "A misrepresentation induces a

4  party's manifestation of assent if it substantially contributes

5  to the decision to manifest assent." <u>LaPeter</u>, 2007 WL 2608837,

6  at *4 (citing Restatement (Second) of Contracts § 167 (1981)).

7      Misrepresentations on the part of a nonparty to the

8  contract may also, under some circumstances, render a contract

9  voidable by the recipient of the misrepresentation. <u>Nyonteh v.</u>

10 <u>Peoples Sec. Life Ins. Co.</u>, 958 F.2d 42, 46 (4th Cir. 1992);

11 Restatement (Second) of Contracts § 164(2) (1981). <u>But see</u>

12 <u>Camofi Master LDC v. College P'ship, Inc.</u>, 452 F. Supp. 2d 462,

13 471 (S.D.N.Y. 2006) ("A defense of fraudulent inducement cannot

14 be maintained where the fraud was not committed by the note

15 holder but by a third party instead."). However, in the case of

16 a nonparty misrepresentation, the contract is not voidable by the

17 recipient of the misrepresentation if the other contracting party

18 transacted in good faith without reason to know of the

19 misrepresentation. <u>See</u> <u>Blum v. William Goldman Theatres</u>, 164

20 F.2d 192, 197 (3d Cir. 1947); Restatement (Second) of Contracts §

21 164(2) (1981).

22      In the present case, defendants do not contend that the

23 Oxarangos' assent to the 1979 note was procured by material

24 misrepresentations made by the FSA. They do contend, however,

25 that the Bank misrepresented to the FSA the Oxarangos'

26

27

28

18

qualifications for the loan.[4]  Communications between the Bank

and the FSA show that Broadhead represented that the Oxarangos

were then experiencing economic difficulties, including

significant capital expenditures, increased production costs,

losses due to drought, and depredation of their sheep by coyotes.

(Gillespie Decl. Exs. O, P.)  The FSA considered these

representations when approving the loan.  (Id. Ex. S.)  By

affidavit, Rose Oxarango specifically denies the accuracy of

these representations.  (Oxarango Aff. ¶ 25.)

        The Oxarangos, though, were not aware of the Bank's

representations to the FSA until years later when they examined

the FSA's files.  (Oxarango Aff. ¶¶ 24, 26-27.)  Defendants argue

only that the FSA "bought into the Bank's reasons," not that the

Bank's representations affected the Oxarangos' assent to the

agreement.  (Defs.' Opp'n Mem. 13.)  Because the Oxarangos were

unaware of these statements at the time of execution of the 1979

note, these representations could not have "substantially

contribute[d] to the[ir] decision to manifest assent."  LaPeter,

2007 WL 2608837, at *4.

        With regard to misrepresentations allegedly made

directly to the Oxarangos, Rose Oxarango states that she and her

husband applied for the 1979 loan based upon the Bank's

representations that their finances were in arrears and that the

loan was necessary to allow the Bank to increase its ability to

---

    [4]    The 1979 loan was an Economic Emergency loan.
(Gillespie Decl. Ex. T.)  According to FSA regulations, such
loans were to be directed to farmers and ranchers who needed such
credit for their operations but were unable to obtain sufficient
credit from normal credit sources because of national or area-
wide economic stresses.  7 C.F.R. §§ 1945.102, 1945.105 (1979).

lend the Oxarangos more money.  (Oxarango Aff. ¶ 19.)  Taken in

the light most favorable to the nonmoving party, those

representations could be construed to refer to loans made under

the Contract of Guarantee--loans the defendants dispute were

actually and legitimately made by the Bank.  (Oxarango Aff. ¶¶

15-18.)  Consequently, the Bank's statements inducing the

Oxarangos' application for the loan may have been fraudulent if

the Oxarangos' legitimate obligations were not in arrears.  There

is no indication, however, that the FSA--the other party to the

1979 note--had reason to know that representations made by the

Bank to the Oxarangos were fraudulent.  The 1979 note is thus not

voidable, since the FSA acted "without reason to know of the

[nonparty's] misrepresentation."  Restatement (Second) of

Contracts § 164(2) (1981).

There is thus no genuine issue of material fact as to

the absence of fraud in the procurement of Oxarangos' assent to

the 1979 note.

3.   <u>Laches</u>

"'[I]t is well settled that the United States is not .

. . subject to the defense of laches in enforcing its rights.'"

<u>United States v. McLeod</u>, 721 F.2d 282, 285 (9th Cir. 1983)

(quoting <u>United States v. Summerlin</u>, 310 U.S. 414, 416 (1940)).

Some courts of appeals, however, have suggested that a defense of

laches may lie against the United States in certain

circumstances.  <u>See</u> <u>United States v. Admin. Enters., Inc.</u>, 46

F.3d 670, 672-73 (7th Cir. 1995) (listing potential scenarios in

which a valid laches defense may be asserted, including when the

United States acts as a holder of commercial paper (citing

Clearfield Trust Co. v. United States, 318 U.S. 363, 369 (1943));
Cayuga Indian Nation of N.Y. v. Pataki, 413 F.3d 266, 278-79 (2d
Cir. 2005) (agreeing with the Seventh Circuit that a laches
defense may be asserted against the United States three main
situations: in the most egregious instances of laches, when there
is no relevant statue of limitations, and when the government
seeks to enforce private rights); cf. JANA, Inc. v. United
States, 936 F.2d 1265, 1269 (Fed. Cir. 1991) ("[I]t is not
entirely clear whether the defense of laches may be asserted
against the government.").

The Ninth Circuit, however, has specifically rejected a
laches defense as "meritless" in an action to collect on federal
loans.  See United States v. Menatos, 925 F.2d 333, 335 (9th Cir.
1991) (rejecting a laches defense in an action to collect on
defaulted federal student loans) superseded by statute on other
grounds, as recognized in United States v. Phillips, 20 F.3d
1005, 1007 (9th Cir. 1994).

Moreover, an action by the United States to recover a
deficiency judgment following foreclosure on a deed of trust is
subject to a six-year limitations period as an action for money
damages founded on a contract, United States v. Dos Cabezas
Corp., 995 F.2d 1486, 1489 (9th Cir. 1993), there is no question
here that the Government does not seek a deficiency judgment.
(Gov.'s Mem. Supp. Mot. S.J. 2.)  Accordingly, the Government's
action is not limited by either a limitations period or laches.

Even if it were applicable, a defense of laches
requires an unreasonable delay by the plaintiff and prejudice
therefrom to the defendant.  Danjaq LLC v. Sony Corp., 263 F.3d

21

942, 951 (9th Cir. 2001) (citing <u>Couveau v. Am. Airlines, Inc.</u>,
218 F.3d 1078, 1083 (9th Cir. 2000)); <u>see</u> <u>JANA</u>, 936 F.2d at 1269-
70.  Here, while decades have passed since the Oxarangos
defaulted on their loans, the delay has not been unreasonable.
The Oxarangos did not default on their FSA loans until 1985, the
same year they entered bankruptcy.  Thereafter, from 1992-1995,
the Oxarangos were involved in administrative proceedings
concerning loan servicing programs for their FSA loans.
Proceedings related to loan servicing are known to be "lengthy,"
<u>United States v. Einum</u>, 992 F.2d 761, 762 (7th Cir. 1993), but
the FSA may not proceed with collection activities until
borrowers have had the opportunity to appeal decisions on loan
servicing, <u>see</u> 7 U.S.C. § 2001(g); <u>United States v. Pritchett</u>
<u>Farms, Inc.</u>, No. 07-3090, 2008 WL 4282754, at *3 (E.D. Wash.
Sept. 17, 2008).

        Following the Oxarangos' final loan-servicing
administrative appeal, the FSA accelerated their debts in 1995.
The instant action was then filed in 1997, but was dismissed by
stipulation when the Oxarangos filed an administrative complaint
asserting a claim of discrimination.  That matter was not
resolved until 2007.  This action was then re-opened on January
3, 2008.  Thus, the time line of events following the Oxarangos'
default, including the administrative appeals that delayed the
filing of this action, does not evidence the kind of unreasonable
delay required of a laches defense.  <u>See</u> <u>Cornetta v. United</u>
<u>States</u>, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988) (explaining that
"the delay must be unreasonable and unexcused" before laches
applies).

1    There is therefore no genuine issue of material fact
2    regarding the inapplicability of the defendants' laches defense.
3         4.   Payment of the 1972 Loan
4         Defendants do not dispute the enforceability of the
5    1972 note or that the Oxarangos last submitted a payment in 1984.
6    Instead, they assert only that if the 1979 note is found
7    unenforceable, the Oxarangos' payments on that note should be
8    applied to their debt under the 1972 loan.  (Defs.' Opp'n Mem. 3-
9    4.)  Since the court has found the 1979 note enforceable,
10   defendants have no defense to the enforcement of the 1972 note.
11        Accordingly, there are no genuine issues of material
12   fact concerning the enforceability of the 1972 and 1979 notes and
13   mortgages or the Oxarangos' default, and the Government is
14   entitled to judgment as a matter of law.
15        IT IS THEREFORE ORDERED that plaintiff's motion for
16   summary judgment be, and the same hereby is, GRANTED.
17        Within 20 days of the date of this Order, counsel for
18   the Government shall lodge a form of Judgment consistent with
19   this Order.
20   DATED:  December 24, 2008
21
22   _____
23   WILLIAM B. SHUBB
     UNITED STATES DISTRICT JUDGE
24
25
26
27
28